# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OCIMUM BIOSOLUTIONS, INC. | ) | Case No. 11-13310 (BLS) |
| | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF ANURADHA ACHARAYA
## IN SUPPORT OF FIRST DAY PLEADINGS

I, Anuradaha Acharaya, hereby certify, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief Executive Officer ("CEO") of Ocimum Biosolutions, Inc. (the "Debtor").

2. The Debtor is a corporation organized and existing under the laws of the State of Delaware. My current duties for the Debtors include overseeing the Debtor's business operations, sales, overall financial condition, monitoring the Debtor's receipts and disbursements of cash, assisting in preparing financial projections (in consultation with the Debtor's senior management team), and communicating with, among other parties, the Debtor's professionals, and the Debtor's secured lender, SunTrust Bank ("SunTrust"). I am authorized by the Debtor to submit this Declaration on its behalf and have personal knowledge of the facts set forth herein.

3. As CEO of the Debtor, I am familiar with the Debtor's books and records, results of operations, and the ability of the Debtor to maintain their operations under various liquidity scenarios. As a result of that familiarity and my first-hand experience, I have formed opinions regarding the necessity for the relief sought in the Debtor's first-day motions and applications, especially to the extent that such relief will enable the Debtor to continue to operate as they pursue a going-concern sale or other sales of substantially all of their assets.

{P0131032}

4.      I therefore submit this Declaration in support of the first-day motions and applications described below, as well as other motions and applications of the Debtor in the above-captioned chapter 11 case. Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, my review of relevant records and documents, information from the Debtor's employees or advisors, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5.      Based on my personal knowledge and the review discussed above, I believe that the relief sought by the Debtor in the first-day motions and applications is necessary to enable its chapter 11 bankruptcy estate to be administered effectively. Failure to grant such relief would have a serious, negative effect on the Debtor's efforts to continue operating during its chapter 11 case and pursue and consummate a going-concern sale or other sales of substantially all of its assets. Part I of this Declaration describes the business of the Debtor, its debt structure, and key events leading to the filing of the Debtor's chapter 11 petition. Part II of this Declaration sets forth relevant facts in support of the various first-day motions and applications filed by the Debtor concurrently with this Declaration.

## I.     BACKGROUND

*The Debtor's Structure*

6.      Gene Logic was acquired by Ocimum December 2007 and the integration into the parent company was intended reduces expenses by moving information technology and general and administrative expenses to the parent company, Ocimum Biosolutions (India) Ltd. (the 'Parent Company"). Ocimum saw a rapid increase in revenues for the services division for the first two fiscal years. Ocimum's information product line, as successor to Gene Logic's

information network, collected significant revenues from the Information Product sales in 2008 and 2009.

7. Ocimum's Information Product was not, however, immune from the economic crisis that occurred throughout the global economy.

8. As a result of the drastic decline in the global economy, private equity and venture capital became unavailable to many of our customers who accordingly reduced budgets for research. As their budgets decreased, number of our customers were acquired cceased operations.

9. Mega mergers in Pharma also started to have an impact on Ocimium's sales mainly of Information Product. On the other hand, the service component of Ocimum's business was trending upward. Ocimum was forced to layoff employees at that time.

10. The Board decided that it was opportune to find a new leader for the Gene Logic operations, Information Products. A new President, Dr. Norman Russell was brought in September 2010 to raise capital for the company and to manage the profit and loss for Gene Logic. That change was not successful and resulted in problems with Ocimum's sales team. Several key management team members also left during this period.

As income declined, the cost of the rent became unmanageable and the landlord was unwilling to decrease the rent. The landlord commenced eviction proceedings. Ocimum was experiencing huge shortfalls in collections and accordingly. we unable to maintain sufficient amounts of eligible accounts receivable to have availability for operating expenses through our revolving credit line at SunTrust Bank.

11. On or about September 21, 2011, SunTrust Bank swept our operating account in an amount in excess of $240,000

12. The sheriff eventually scheduled an eviction for October 17, 2011, at 9:30 a.m. Ocimum filed this chapter 11 case at 6:40 a.m. on October 17, 2011 (the, "Petition Date"). Prior to the Petition Date, the Debtors retained Sherrill and Company to provide investment banking advisory services including obtaining funding, financing, or acquisition for or of Ocimum.

13. The Debtor commenced this chapter 11 case in order to implement a competitive sales process and effectuate a sale of the Debtor's assets through a chapter 11 sale process. The Debtor intend to retain Sherill and Company as marketing and sale consultant to assist them during this chapter 11 case and in connection with the sale process.

14. SunTrust has confirmed its support for the Debtor and has consented to the potential sale of the Debtors' assets through a Chapter 11 sale. SunTrust has agreed to allow the Debtor to use cash collateral to finance the Debtor's chapter 11 case through and for a limited time after the conclusion of the sale process. access to cash collateral will enable the Debtor to: (a) continue operations pending the marketing of the Debtor's assets, and (b) after the sale process concludes, consider strategies for disposition of their remaining assets and the continuation or conclusion of its chapter 11 case.

*Existing Credit Facility*

15. As of the commencement of the Debtor's chapter 11 case (the "Petition Date"), Ocimum, as borrower was a party to Commercial Note dated February 20, 2009 and Agreement to Commercial Note dated February 20, 2009, as amended by the First Modification of Commercial Note and Agreement to Commercial Note dated July 1, 2009 and Commercial Note dated May 14, 2010 by the Borrower in favor of SunTrust in the original principal amount of $2,250,000; a Commercial Note dated October 20, 2009, by the Borrower in favor of the Lender in the original principal amount of $147,302.00; a Commercial Note dated March 30, 2010, by

the Borrower in favor of the Lender in the original principal amount of $232,850.00; a Commercial Note dated June 30, 2010 by the Borrower in favor of the Lender in the original principal amount of $169,462.80; a Commercial Note dated November 16, 2010 by the Borrower in favor of the Lender in the original principal amount of $181,470.00; a Commercial Note dated February 11, 2011 by the Borrower in favor of the Lender in the original principal amount of $198,194.81 (collectively, the "(SunTrust Notes"). The SunTrust Notes represent (i) a Revolving Master Borrowing Loan, as amended, in the original principal amount of $2,250,000 and five (5) separate equipment loans in the amounts set forth above.

16. In order to secure the repayment of the SunTrust notes, Ocimum executed a Security Agreement dated February 20, 2009, pursuant to which the Debtor (i) granted a blanket security interest in all of the Debtor's assets and property, including, but without limitation, all accounts, chattel paper, deposit accounts and all cash, and other property deposited therein or otherwise credited thereto, documents, equipment, fixtures, general intangibles, instruments, intellectual property, patents, inventory, investment property, letter-of-credit rights, commercial tort claims, other property, books and records pertaining to the Collateral, and all proceeds, supporting obligations and products of any and all of the foregoing Collateral, all as set forth more fully in the loan, credit and security agreements among the Debtor and the Lender thereto.

17. On February 23, 2009, corporate guaranties of the SunTrust Notes were executed by Ocimum Biosolutions (India) Ltd., the Debtor's parent, Gene Logic Ltd., Gene Logic K.K. and Ocimum Germany GMBH. To the best of the Debtor's knowledge, Gene Logic Ltd., Gene Logic K.K. and Ocimum Germany GMBH are now defunct.

18. The amounts borrowed under the SunTrust Notes were used to, among other things, re-finance existing debt and fund working capital requirements. As of the Petition Date, approximately $2,642,400 was outstanding under the SunTrust Notes.

19. On or about December 6, 2010, Ocimum entered into a Loan Agreement with Kubera Cross-Border Funds, L.P. ("Kubera") pursuant to which Kubera agreed extend a term loan to Ocimum in the amount of $2,500,000 (the "Kubera Loan").

20. On or about December 6, 2010, Ocimum executed a promissory note (the "Note") evidencing its repayment obligation to Kubera. Repayment of the Note was secured by a security interest pursuant to which Ocimum granted a security interest in all of its personal property to Kubera.

21. Ocimum Biosolutions (India) Ltd, the Debtor's parent, executed guaranty of the repayment of the Note or or about December 6, 2010.

22. SunTrust, Ocimum and Kubera executed a Subordination Agreement on or about December 6, 2010. Under the Subordination Agreement, Kubera's right to repayment is expressly subordinate to "all indebtedness not exceeding a principal amount of $3,000,000, of the Borrower to SunTrust under now existing or hereafter arising."

23. As of the Petition Date, approximately $2,812,500 was outstanding under the Kubera Loan.

24. In addition to the outstanding obligations under SunTrust Notes and the Kubera Loan, the Debtor estimates that it has unsecured trade debt in the aggregate amount of approximately $794,000 and an additional approximately $695,000 owed to its Landlord, not including rejection damage claims that may be asserted by contract counterparties. Finally, the Debtor has a total of approximately $1.6 million of unpaid local, state and federal payroll tax obligations.

## II. FACTS IN SUPPORT OF FIRST DAY PLEADINGS

25. The Debtor has respectfully requested that the pleadings described below (the "First Day Pleadings") be granted as critical elements in successfully administering their

bankruptcy estates. I offer the following factual background in support of the First Day Pleadings:

### A. Employee Wages Motion

26. As of the Petition Date, the Debtors employed approximately 23 full-time and 2 part-time salaried employees.[1]

27. The Debtor seek authority to pay the Prepetition Payroll and the October 28 Payroll. The Debtor seeks this relief because the continued and uninterrupted service of the employees is essential to maximize the value of the Debtor's estate for the benefit of its creditors, especially in light of the proposed sale of the Debtor's assets.

28. Approximately $87,000.00 in salaries have accrued prior to the Petition Date and remains unpaid.

### C. Account Maintenance, Existing Business Forms and Cash Management Motion

29. Prior to the Petition Date, the Debtor, in the ordinary course of their business, maintained numerous bank accounts.

30. Dismantling the Debtor's cash management system would likely disrupt the Debtor's relationships with its key stakeholders and may hinder its abilities to continue operations pending a going-concern sale.

31. Maintenance of the bank accounts would greatly facilitate the Debtor's transition to post-petition operations and preserve the value of the Debtor for any purchaser that results from the proposed sale process. Closing the bank accounts and transferring the funds in those accounts to newly created post-petition accounts would be disruptive and time consuming.

---

[1] Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the First Day Pleading it is then being used to describe.

Moreover, requiring the Debtor to close or alter the bank accounts would greatly complicate and disrupt the cash management system currently in place, likely to the detriment of the Debtor's estates and creditors.

32. The Debtor currently maintains the bank accounts at SunTrust Bank and Citibank.

33. Given the corporate and financial structure of the Debtor and the fact that it has been operating in Chapterr 11 for over three weeks without making any payment to any Person, it would be difficult, if not impossible, for the Debtor to establish an entirely new system of accounts and a new cash management system. For example, if the Debtor was required to open separate accounts as debtor in possession and rearrange its cash management system, there would be further delays in the Debtor's ability to operate its business.

34. In the ordinary course of business, the Debtor uses a number of business forms, including checks, letterhead, purchase orders, and invoices. If the Debtor was required to obtain new business forms as a result of the filing of these cases, it would incur significant expense and attendant delay in effectuating certain postpetition transactions during this time period.

### D.     Cash Collateral Motion

35. The Debtors request that the Court authorize them to use cash collateral pursuant to the terms of the Emergency Cash Collateral Stipulation and Interim Order (the "Cash Collateral Stipulation").

36. Without immediate access to the cash collateral, the Debtor will not have the liquidity required to continue operations and/or solicit bids and consummate a going-concern sale or sales of substantially all of its assets. The Debtor requires the cash collateral to be able to pay their payroll and operating expenses (including the costs and expenses of this chapter 11 case) and generally preserve going concern and asset value. The going-concern sale of substantially all of the Debtor's assets will allow the Debtor to realize the highest possible value

of its business for the benefit of its creditors. Accordingly, the use of cash collateral is necessary for a successful sale or sales that will allow creditors to realize the maximum value on account of their claims and the absence of such funds would immediately and irreparably harm the Debtor, its estate and its creditors.

37. The Debtor and SunTrust engaged in extensive, arms'-length negotiations with respect to the terms and conditions of the Cash Collateral Stipulation and Interim Order . Importantly, the Cash Collateral Stipulation provides that the Debtor may draw immediately (on an interim basis) to meet their administrative and operational obligations during the early stages of this chapter 11 case, a very critical period for preserving going-concern values.

38. The Debtor and SunTrust also agreed upon a budget (the "Budget") projecting cash flow through December 31, 2011. On a weekly, the Debtors will provide to SunTrust a report detailing the Debtor's actual use of cash collateral in accordance with the Budget.

39. The provisions of the Cash Collateral Stipulation were extensively negotiated. The Stipulation enables the Debtor to obtain the financing necessary to maintain its operations and pursue a

40. Approval of the Cash Collateral Stipulation will provide the Debtor with immediate and ongoing access to borrowing availability to pay its current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtor will be forced to cease operations, which would likely: (a) result in irreparable harm to its business; (b) deplete going concern value; and (c) jeopardize the Debtor's ability to consummate the contemplated sale and maximize value. The credit provided under the Cash Collateral Stipulation and the use of will enable the Debtor to satisfy its vendors, service its customers, pay its employees and operate its business in the ordinary course, pending the proposed sale, and in an orderly and reasonable manner to preserve and enhance the value of

their estate for the benefit of all stakeholders. The availability of Cash Collateral will provide confidence to the Debtor's creditors that will enable and encourage them to continue their relationships with the Debtor. Accordingly, the timely approval of the Cash Collateral Stipulation is imperative.

41. The Debtor's liquidity needs can be satisfied only if the Debtor is immediately authorized to use Cash Collateral to fund its operations. The Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b) or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). The Debtor has not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought.

42. Substantially all of the Debtor's assets are encumbered and the Debtor has been unable to procure the required funding absent granting the proposed superpriority claims and liens. The Debtor submits that the circumstances of this case require the Debtor to obtain the use of Cash Collateral and, accordingly, the Cash Collateral Stipulation reflects the exercise of their sound business judgment. Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with damaging consequences for the Debtor and its estate and creditors.

**E.   Utilities Motion**

43. The Debtor currently uses electric, natural gas, heat, water, sewer and other similar services provided by the Utility Companies. The Debtor's Utility Companies provide traditional utility services related to the day-to-day operation of the Debtor's various facilities and offices. The Debtor estimates that its aggregate average monthly obligations to the Utility Companies on account of services rendered total approximately $45,000.

44. Uninterrupted service from the Utility Companies is essential to the Debtor's continued operation and successful sale of substantially all of their assets. The Debtor could not maintain their facilities in the absence of continuous service. It is therefore critical that the Utility Companies continue to provide uninterrupted services to the Debtor.

45. The Debtor intends to timely pay its postpetition obligations to the Utility Companies. The Debtor will make its payments with cash generated during these chapter 11 cases and $175,000 of funds swept by SunTrust Bank prepetition and returned to the Debtor's account upon the entry of the proposed Cash Collateral Order.

## CONCLUSION

46. Accordingly, for the reasons stated herein and in each of the motions and applications set forth above, the Debtor requests that the Court approve the corresponding orders submitted with each First Day Pleading.

I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge, information and belief.

Dated: November 8, 2011
Gaithersburg, Maryland

_____
Anuradha Acharaya
Chief Executive Officer